**DORNETTE, et al., Plaintiffs-Appellees, v. ALLAIS, et al., Defendants-Appellants.**

Ohio Appeals, First District, Hamilton County.

No. 6514.   Decided July 2, 1945.

Charles E. Weber, Cincinnati, for plaintiffs-appellees.
John D. Ellis, Cincinnati, and Ed. F. Alexander, Cincinnati, for defendants-appellants.

## OPINION

By ROSS, J.

This is an appeal on questions of law from a declaratory judgment entered by the Court of Common Pleas of Hamilton county, Ohio, in which that Court announced answers to seven interrogatories propounded by the plaintiffs, Trustees of the Woodward College and High School, and passed upon the prayer of a cross-petition of a defendant, the Board of Education of the School District of the City of Cincinnati. Other defendants were the Trustees of the Hughes Fund, the City of Cincinnati, and the State of Ohio. The members of such Board of Education are the appellants.

The evidence in the trial court consisted of a stipulation which included a certain pamphlet attached to the petition as an exhibit. This pamphlet contained copies of several trust deeds, establishing a trust and special acts of the legislature of Ohio appertaining thereto.

It appears that since the year 1851, the high school system of the City of Cinncinati has been under the direction of an anomalous body, entitled The Union Board of High Schools, which was created by virtue of a contract entered into by the "Trustees and Visitors of Common Schools of the City of Cincinnati on the one hand and the Trustees of Woodward

College and High School and Trustees under the Will of Thomas Hughes, on the other."

The powers and duties of the Woodward Trustees and the method of their appointment were established by trust deeds from William Woodward and confirmed by special acts of the legislature in 1826 to 1831. In 1883, by legislative act, the method of selecting such trustees was changed from that provided for in the trust deeds.

William Woodward died January 24, 1833. Prior to his death, he executed certain deeds conveying now valuable areas in the City of Cincinnati to certain trustees, the revenue to be used for the education of the poor children of the City of Cincinnati. A special Act of the legislature, January 15, 1831, provided for the incorporation of such trustees, specifying the beneficiaries of the trust as "such children only as have no parents living within the limits of said city of sufficient ability to provide for their instructions."

On the property conveyed by one of such trust deeds from William Woodward to such trustees has been erected by such Board of Education a high school building. This same property originally was occupied by a building erected by the trustees and succeeded by other buildings erected for high school purposes by the Board of Education.

The chief bone of contention between the adversaries in this action is whether or not the Board of Education should pay the Woodward Trustees for this property now used by the Board of Education for general high school purposes, or, whether the use thereof by such Board of Education is in conformity to the terms of the trust conveying it to the Woodward Trustees.

A more general problem is also presented involving this specific question—whether the use of revenue from the property conveyed by William Woodward to his trustees may be used for general educational purposes in the school district— being commingled with the general funds of the Board raised by taxation, and still the purposes and directions of the trust be substantially fulfilled?

The appellants maintain the affirmative on both questions.

Such inquiries, which in substance cover the full scope of the interrogatories presented by the assignments of error require an examination of the several conveyances and special legislative acts as well as the development of the educational system of the City of Cincinnati, its control, management and administration under the Union Board of High Schools and the Board of Education of such City.

The original deed of Woodward (Nov. 24, 1826) contains certain expressions of the grantor's purpose and intent, which

define the limitations of the trust and reflect directly upon the questions presented. It is stated therein:

"in consideration of the better educating of the poor children of Cincinnati,"

"to be held, used, and applied for founding and maintaining a free school for the education of poor children of the said city of Cincinnati, in reading, writing, arithmetic, and English grammar; the said school to be established in the said city of Cincinnati, and to be managed and directed by the grantees in this deed named, and their successors perpetually,"

"The said two trustees first above named to procure from the legislature of this state an act of incorporation as soon as convenient, and when such act is passed to make such conveyance as may be necessary for vesting the property and right, title, and interest thereof in such incorporation, and the trustees thereof in manner aforesaid forever."

"The benefits of this trust not to be confined to any particular religious sect or denomination, or the doctrines of any particular religious sect to be taught in said institution, nor any persons to be trustees or teachers thereof not possessing good moral characters and believers of doctrine of the Christian religion."

In the special act of incorporation (January 24, 1827) appears also certain pertinent statements:

"Be it enacted by the General Assembly of the State of Ohio, That Samuel Lewis, Osmond Cogswell, and Jonathan Pancoast, trustees of the said land, and their successors in office (appointed as hereinafter mentioned), be and they are hereby created a corporation and body politic by the name and style of "The Trustees of the Woodward Free Grammar School," by which name they are hereby made capable of holding, using, and improving the said property,"

"Provided always, that the said trustees shall have no power to grant, transfer, or convey the said lands so vested in them, except as hereinafter provided."

"That such children residing in the City of Cincinnati, and such children only as have attained the age of five years or upwards, and being under the age of sixteen years, and have no parents or other near relatives, living within the limits of the said city, of sufficient ability to provide for their instruction in the common and necessary branches of an English education, or whose parents or other near relatives, though being of sufficient ability, utterly neglects and refuses to provide such instruction for them, shall be admitted into

the school or schools which may hereafter be established, under this act: Provided, however, that the trustees may, at any and all times, admit other children into such school or schools, upon condition of receiving therefor what to them shall seem a reasonable compensation."

"That the instruction afforded to the children coming within the provisions of this act, shall be confined to the common and necessary branches of an English education, and shall not be extended to the higher branches of such an education, so long as the fund arising from said lands is insufficient to provide the means of instruction for all the poor children in the said city of Cincinnati; that the trustees shall have the power to decide upon the eligibility of applicants for admission,"

"the said trustees and their successors shall have power to make beneficial leases of all or any part of the said lands, for the term of fifteen years each, or for a longer period, if the extended lease contain a clause of revaluation every fifteen years."

The act provides for the appointment of successor trustees by the Mayor and Council of the City of Cincinnati or the Judges of the Common Pleas Court, and for annual accounting of the trustees to such authority.

It is further provided:

"It shall be the duty of the said trustees to lease the said lands in the most beneficial manner, and as soon as a sufficient sum of money shall be raised thereby, to locate and erect a commodious building, to be used and occupied as a school-house; to procure teachers of good morals and well qualified to instruct, and to receive so many of the above described children as the said building will accommodate and the state of the funds will allow;"

"but in case the said trustees, or either of them, on application made as aforesaid, shall refuse to render his or their account as aforesaid, then he or they shall be considered as having abandoned the trust, and the said mayor and aldermen, or the said Court of Common Pleas as aforesaid, may proceed to appoint his or their successor or successors, as is provided in the fifth section of this act, and shall also have full power to compel the said trustee or trustees to account for the same, by an action at law or a suit in chancery, and apply the proceeds of the said action or suit to the purposes aforesaid."

In a deed of confirmation from William Woodward (March 24, 1828) the grantor, ratified the incorporation of

the trustees and regranted to the incorporated trustees the lands mentioned in the first deed and iterated the limitations and provisions applicable to the trust as contained in the first deed.

In 1828 the first "common school" was opened to the public.

When a common school education thus became available to all children of the City, both poor and rich alike, William Woodward realized that the beneficiaries of his generosity must be changed as those provided for in his eariler deeds and the special act, to-wit, the "poor children of the city of Cincinnati" were now fully provided for under the general system of common school education, furnished at the expense of the tax payers of the City. This becomes apparent by the terms of his deed to the incorporated trustees: (May 25, 1830)

"whereas, divers good and sufficient reasons exist that render it desirable (for the purpose of making the conveyance aforesaid more extensively useful) to change to a certain extent the direction or application of said fund, so as to enable the said trustees and their successors in office to establish a high school for teaching the higher branches of learning and literature with the arts and sciences: * * * Therefore, * * * This indenture witnesseth, that the said William Woodward, in consideration of the premises, and in consideration of the sum of one dollar in hand paid by them, the said trustees, has given, granted, aliened, conveyed, released, and confirmed, and by these presents doth give, grant, convey, and release, and confirm until the said Samuel Lewis, Osmond Cogswell, and Lewis Howell, in their corporate capacity as trustees * * * the lands, tenements, and premises referred to and described in the said deeds of conveyance, to have and to hold the same unto them and their successors, in their corporate capacity, with full power to appropriate the funds and lands and property held by them as aforesaid, to the purpose of education in any and every branch of learning and science, as to them shall appear most useful, and also with full power to procure an alteration in their charter, so as to allow them in their corporate character to establish a high school in the city of Cincinnati, for the uses and education of that description of children and young men as is pointed out in the first deed above referred to, the said William Woodward declaring hereby his assent to such alteration of the charter aforesaid, as shall by the said trustees and their successors in office and by the General Assembly of the State of Ohio, be thought most likely to extend the advantages

of learning and science among those who have not the means of procuring such advantages themselves,"

It is particularly illuminating as to the continuing intent of Woodward, in view of the present situation confronting the Court, that Woodward thus immediately extended the scope of his generosity to include a new class of poor youth ("young men"), being aware that those who would qualify for the class of beneficiaries in the earlier deeds were now provided for in the public free schools. The same situation has occurred now after the grantor is dead. The free public school system has been extended not only to include students on the grammar schools, but also those qualified to attend high schools. What would William Woodward have done when presented with this situation? Is it not perfectly apparent that he would have again accepted the situation, and again extended his bounty to those not provided for by the public school system, in other words, again modified the trust to extend to education of the needy in college or university, abandoning those otherwise provided for.

By deed (December 16, 1830) Woodward conveyed to his trustees the premises now occupied by the present Woodward High School. This deed contains the following provisions:

"in consideration of the better educating the rising generation"

"Provided always, that the lands and tenements hereinbefore described are to be appropriated to the purposes of education, and a high school shall be established and the buildings for the same erected on said premises as soon as in the opinion of the trustees thereof it shall be thought convenient and proper, in which school shall be taught all the branches that are usually taught in high schools, and all other branches that shall be directed by the trustees thereof, the school so to be founded to be called "The Woodward High School of Cincinnati,"

"and for educating in said high school the same description of children as are provided for in the deed executed by the said Woodward on the twenty-fourth day of November, eighteen hundred and twenty-six. The said high school, with the premises hereinbefore described, and all the property, real and personal, belonging thereto, and every part and parcel thereof, to be managed by and under the exclusive control of five trustees,"

"It is part of this conveyance and a condition annexed

that said Lewis and Cogswell shall have the privilege of educating each two scholars, making in the whole four scholars in said high school continually free and clear of all expense as the only pay they have or ever will receive for their efforts to make the donation aforesaid available, and their successors shall be entitled to the same privilege forever so long as they remain trustees thereof."

The last quotation from this deed in its character of an exception emphasizes most strongly the continuing determination of the grantor that the trust as a whole is for the benefit of the poor children of the City. In a special act of the legislature (January 15, 1831), similar privileges, powers, limitations, and restrictions, as those found in the act of January 24, 1827, appear, only the new purposes of the trust being recognized, extending to high school facilities.

On October 24, 1831, Woodward High School, as so provided for in deed and act of the legislature was opened in a two story building, erected upon the lot so deeded, and now occupied by the present Woodward High School. The high school as such was functioning in conformity to the provisions of the trust, when William Woodward died on January 24, 1833.

On January 27, 1835, the Trustees, by act of the legislature, were empowered to mortgage the trust property. On June 7, 1836, the Trustees, by act of the legislature, were authorized to establish a college:

"Be it enacted by the General Assembly of the State of Ohio, That the trustees incorporated by the act to which this is an amendment, and their successors in office, shall have power to establish a college department, to be governed and managed by said trustees, and their successors in office, to be called 'The Woodward College of Cincinnati.'

"Sec. 2. That the said trustees, and their successors in office, shall have power to confer all such degrees as are usually conferred in colleges and universities: Provided, that they shall not establish a medical, law, or theological department, or confer degrees in medicine, law, or divinity.

"Sec. 3. That the said trustees, and their successors in office, shall be authorized to appropriate such part of the funds of the institution as to them shall appear proper, to defray the expense of educating in such college that class of students described in the second section of the act to which this is amendatory:"

On January 25, 1836—"Woodward College of Cincinnati" was opened in the same building occupied by Woodward

High School. In 1841, a third story was added to the building. On February 11, 1846, an act of the legislature was passed permitting the educational authorities in Cincinnati and Dayton to establish high schools—with a provision that the exercise of such privilege should not jeopardize the operation of the common school or lower grades.

And then in 1847 the first public high school was opened in Cincinnati and except for the operation of "Woodward College" again the beneficiaries of the trust, the poor youth of Cincinnati, received freely without cost, at the expense of the taxpayers of the City of Cincinnati that which was provided for them by the trust of William Woodward.

Is it not apparent, that if William Woodward had been still able to modify his trust provisions, that he again conforming to his past conduct would have taken measures to again provide for these same beneficiaries, the poor youth of Cincinnati, by providng for them as far as the revenue of the trust would permit a college education? Apparently, the trustees had anticipated just this very contingency and those Trustees, took steps in securing authority for a college in 1836, to meet what they must have seen would occur— general free high school facilities for all the children and youth of Cincinnati.

On March 17, 1850, wisely the Woodward Trustees discontinued the high school department. And on March 20, 1851, due to lack of funds, the Trustees were compelled to discontinue the college. In the same year the Trustees entered into a wholly unauthorized contract, completely violative of the manifest purposes of their trust, with the trustees and visitors of the common schools. Trustees of a trust fund established by Thomas Hughes for purposes similar to that of Woodward, joined with Woodward, Trustees in this contract. It is stated in such contract that its purpose is to provide:

"for the education of all such children as are entitled to the benefit of common school fund instruction in said city;"

In this contract, the City school authorities were designated party of the first part and the Woodward and Hughes Trustees party of the second part. The contract further provided:

"It is agreed that, as soon hereafter as practicable, high schools for boys and girls—one to be styled the Cincinnati Woodward High School and the other the Cincinnati Hughes High School—shall be established as hereinafter provided, to be under the direction of a board of trustees, which shall be composed of six members, to be elected by the board of

trustees and visitors of common schools from their number, the two permanent members of the Woodward board, the three members of said board elected by the city council, and two members of the Hughes board, elected from their number, making thirteen in all, which board shall have the usual power of trustees for the management of said schools.

"It is further agreed that the party of the first part shall provide as much money as, added to the properties and funds of the second and third parties, will furnish high schools that will accommodate and educate all the white youth of the city who may apply for admission to such high schools, and who may be sufficiently advanced in the several studies, according to the rules that may be prescribed by the board to be appointed as aforesaid:"

"The party of the second part agrees to place at the disposal of the board of trustees herein provided, for the use and support of the high schools contemplated by this arrangement, a lot of ground 220 feet front on Franklin street, by 200 feet deep to Woodward street, with the building thereon, and the net annual income of the Woodward fund, now valued at, say four thousand five hundred dollars per annum."

"both of said buildings shall be erected and the schools therein opened under this agreement immediately after the vacation of 1851, and immediately thereafter and thenceforth the net annual incomes of the properties of the second and third parties shall be paid over quarterly, as collected, to such city officer as shall have charge of other city school funds, to be applied toward the support of the high schools of the city as aforesaid."

On May 19, 1851, the City Council, unqualifiedly ratified this contract as far as the Woodward trust was involved and conditionally as to the Hughes trust. In 1851, Woodward High School opened and was operated in accordance with the terms of the contract, the revenue of the Woodward trust being thrown into the general free public school fund, and the property on which Woodward High School was located being occupied by the free public high school, open to rich and poor alike, and without any compensation to the trust.

In 1855, a new high school building replaced that built by the Trustees.

On June 25, 1862, a further violation of the essential provisions of the Woodward trust was perpetrated, in that, by consent of all parties to the contract of 1851, non-resident paying children were admitted to Woodward High School.

The parties to this contract were thereafter denominated the Union Board of High Schools, and as such illegal body has continued to function up to the present time.

On March 29, 1883, the legislature further infringed upon the trust provisions, by changing the manner of appointment of the trustees, providing for their appointment **only** by the Court of Common Pleas of Hamilton County. From 1851 to 1895—Woodward and Hughes High Schools continued to operate as free public high schools, as far as the citizens of Cincinnati were concerned, but open to non-resident children upon paying a tuition fee. They were the only high schools in Cincinnati.

May 9, 1895, by a contract between the Trustees and the Board of Education, the contract of 1851 was modified to permit jurisdiction of the Union Board over all high schools in the City of Cincinnati (another having been opened) **but** it was further provided that the Board of Education should thereafter have seven instead of six members on such Union Board and that the Superintendent of Schools of the City of Cincinnati should have supervision of the high schools and appointment of teachers thereto. Under the contract of 1851, it will be noted the Union Board of High Schools consisted of 13 members, only six of whom were from the Board of Education or "board of trustees and visitors" as it was then called. Under the new arrangement the Board of Education was given at least an equal representation with the Trustees. That the Trustees of Woodward High School have had no controlling voice in the operation even of that school thereafter is a matter of common knowledge.

In 1918, the second Woodward School Building was replaced with a third High School building, and it is again a matter of common knowledge that this high school, occupying property belonging to the trust estate of William Woodward has more inadequate facilities than any of the other of the modern high schools since erected by the Board of Education, under the guise of the Union Board of High Schools. Among the facilities absent in the equipment of Woodward High School is a playfield or recreation field, and it must be admitted that such facility is more needed for this high school than in any other, as it is found in the now extremely congested area of the City and serves the more under-privileged classes, coming to it from what is commonly known as the "basin of the city." Its absence is mentioned only in passing to indicate how far astray the trustees of the William Woodward fund have gone in diverting the proceeds and revenue of that trust from the clearly defined purposes of his deeds, plainly expressed. Upon this state of facts the trial court reached the following conclusions:

1. Upon Interrogatory No. 1: That the Union Board of High Schools, as now constituted, does not have legal authority and power to manage, control and operate the Public High Schools of the City of Cincinnati.

2. Upon Interrogatory No. 3: That the act of the Legislature, passed on March 29, 1883, so far as it attempted to change the manner and method of appointing Trustees of the Woodward High School of the City of Cincinnati, was invalid.

The court further ordered that the method of appointing the Woodward Trustees, provided for in the Woodward trust deeds, be resumed. The present Trustees to continue to serve until their successors are so lawfully appointed.

3. Upon Interrogatory No. 4. That the trustees have no right to continue to divert funds from the trust in the manner now prevailing, but, that the trustees do have the right, with the approval of the court, to apply such income directly, or through the Board of Education or other agency, to a purpose which will carry out the general intention of William Woodward in operating the Woodward Trust to assist only poor children of the City of Cincinnati in obtaining an education.

4. Upon Interrogatory No. 5. "The Court finds, declares, orders and decrees that no person, group of persons, corporation or board has any right to recover from any person, group of persons or board any of the income or funds which have been paid under the Union Board of High School Contracts of 1851 and 1895 for the operation of the Public High Schools of Cincinnati.

5. Under Interrogatory No. 6. "The Court finds, declares, orders and decrees that the trustees of Woodward High School have the power and authority to use income derived from the trust property under their control to assist financially poor children—those under twenty-one years of age—of Cincinnati in such manner as will enable them to take advantage of the instruction provided by Governmental authorities in the Public Grade and High Schools and at the University of Cincinnati, and further finds that such assistance may include the purchase of shoes, articles of clothing, eye glasses, food, and the furnishing or paying for dental and medical care and other necessities which may be considered necessary by said trustees to enable poor children of Cincinnati to take advantage of the education offered in the Public Schools and at the University of Cincinnati, and may include also tuition and other incidental fees at the University of Cincinnati.

"The Court further finds, declares, orders and decrees that said trustees do not have the power and authority to

use said income to establish, equip, maintain and operate a playground adjacent to and in the vicinity of Woodward High School and to purchase real estate for said purpose, and do not have the power and authority to sell and convey any of the real estate under their control for the purpose of securing funds to procur other land which would be used as a playground."

6. Upon Interrogatory No. 7. "The Court finds, declares, orders and decrees that the Trustees of Woodward College and High School have authority without securing permission and authority of Court to sell and convey by special warranty deed the fee simple title to land acquired by them, which land does not constitute a part of the basic trust funds, and to reinvest the proceeds of said sale in other real estate or approved securities; that the lot fronting 220 feet on the north side of Thirteenth Street and conveyed by deed, dated Dec. 17, 1830, for the specific purpose of erecting thereon a High School building may be sold and the fee simple title thereof conveyed by special warranty deed to the Board of Education, and the proceeds thereof reinvested in other land or approved securities; but that said trustees do not have the right and authority to sell and convey the real estate conveyed to said trustees by the trust deeds of William Woodward, and to reinvest the proceeds from said sale, without showing that retention of said real estate would defeat or substantially impair the accomplishment or purpose of the Woodward Trust and without securing special authority of court to sell any particular parcel of said real estate.

"Authority will be given to the trustees to present testimony, if they desire, concerning the existence of any need to sell any part of the original trust property under their control."

The costs were assessed against the plaintiff Trustees. Such Trustees have taken no appeal from the judgment of the Court.

The appellants object to the conclusions of the trial Court upon Interrogatories Nos. 4, 6, and 7.

These conclusions are, therefore, now to be considered, bearing in mind that in this form of appeal, this Court has only power to affirm, modify, or reverse the judgment of the trial court, and cannot, as it could upon an appeal on questions of law and fact, pronounce entirely new conclusions upon the pleadings and evidence. Error affirmatively prejudicial to the appellants must appear in the judgment of the trial court before its conclusions as to the rights of the parties may be disturbed.

**Art. VI, section 2 of the Ohio Constitution** provides:

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state; but no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state."

**Art. VI, section 3 of the Ohio Constitution** provides:

"Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds: provided, that each school district embraced wholly or in part within any city shall have the power by referendum vote to determine for itself the number of members and the organization of the district board of education, and provision shall be made by law for the exercise of this power by such school districts."

Children between the ages of six and eighteen are required by law to attend the public, private, or parochial schools if mentally and physically capable of doing so.
**Sec. 4849, GC.**
**Sec. 4849-2, GC,** provides:

"Every child of compulsory school age who is not employed on an age and schooling certificate and has not been determined to be incapable of profiting substantially by further instruction shall attend a public, private or parochial school under the conditions prescribed by law."

**Sec. 4849-3, GC,** makes the parent or guardian of such child responsible for such compulsory attendance. Under special conditions, work certificates may be issued at age sixteen, permitting absence from such compulsory education. **Sec. 4851, et seq., GC.**

The board of education of each city is required to furnish school books free of charge to pupils. **Sec. 4854-5 GC.**

**Sec. 4855 GC,** provides for free transportation of pupils, where circumstances require it.

**Sec. 4856 GC,** provides:

"A board of education in a district which does not maintain a high school and which pays the tuition of a school resident of the district in a high school in another district, or a board of education which pays the tuition of a school resident of the district, in a high school in another district,

of higher grade than that maintained in the given district may furnish the cost of such child's room and board while attending such school or a part of such cost, providing such amount is less than the cost of transportation of such child and provided such action is approved by the county board of education."

Sec. 4852-8 GC, provides for hearings before the Juvenile Court upon charges of truancy or failure of parents to cause children to attend school in conformity with the statutes.

It is obvious from a reading of these and related sections that poverty is no excuse for non-attendance at school during the years mentioned. Such being the case, it is also apparent that if poverty interferes with such attendance, the burden rests upon the public at large to remove such impediment by appropriate means. If a normal child proceeds through the ordinary school curriculum, he should at age 18 have completed a full high school course. It is thus apparent that any necessity for private aid to poor children in securing an elementary and a high school education is entirely unnecessary, and that the revenue of the Woodward trust fund would be superfluous if used for such purposes.

On the other hand, requirements for matriculation in medical and law schools require four and two year credits in college or liberal arts. Sec. 1270 GC. See: Rules of Practice of Supreme Court of Ohio, Rule XIV, section 4, 136 Ohio St., LXXVII.

While it would seem clear from the various quotations from the deeds of Woodward and the special acts of the legislature relevant thereto that he excluded those who sought special degrees in the professions from the benefit of his trust, it is now equally clear that providing the means of obtaining collegiate education in the liberal arts and sciences, as a preliminary to further course in such special professions would not only not be a departure from the purpose of the trust, but would be in direct furtherance of the program of extension endorsed by Woodward in his deed of December 16, 1830.

The appellants take the peculiar position of validating the contract of 1851, so far as it permits diversion of the trust funds to the general receipts of the Board of Education but admit freely its invalidity as far as it attempts to give the Trustees any jurisdiction over the use of such funds after such disposition, by permitting control over the schools for whose general benefit such funds are used.

Such inconsistent position is fatal to the logic involved. The contract is either entirely valid, or by virtue of an entire failure of consideration and inherent illegality void in toto.

That in so far as the contract attempts to take control of the schools from the duly constituted authorities, it is invalid, must be perfectly clear. **Secs. 4836, 4834-9 GC.**

The conclusion of the trial court that such contract and the special act of the legislature attempting to validate it, in so far as such contract and act attempt to transfer control of the schools from lawfully constituted authority, or divert the revenue from trust funds to public use, are invalid, must be sustained.

In like manner, the conclusion of the trial court that the special act of the legislature of 1883, attempting to provide a method for appointment of Woodward Trustees different from that designated by Woodward is ineffective to accomplish such result, is also sustained, and the method decreed in the order of the trial court is affirmed.

No objection being made to the order of the trial court, freeing the trustees from past diversion of trust revenue, the order, so freeing them, must also be approved and affirmed.

As any playfield attached to the present Woodward High School or otherwise located could not be operated for the exclusive benefit of the poor children of Cincinnati, and would, in any event, have a doubtful value as a furtherance of the trust provisions, the order of the trial court denying the Trustees the right to use either any part of the corpus of the trust or its revenue for such purpose is approved.

Although no objection is here made to the order of the court providing that the Trustees may use trust revenue to "assist financially poor children—those under twenty-one years of age of Cincinnati in such manner as will enable them to take advantage of the instruction provided by governmental authorities in the Public Grade and High Schools, * * * and that such assistance may include the purchase of shoes, articles of clothing, eye glasses, food and the furnishing or paying for dental and medical care and other necessities which may be considered necessary by such Trustees," such use of the revenue of the trust has a questionable reference to the expressed purposes thereof. However, in the same portion of the order the court approves the use of such revenue to provide assistance to such poor children under twenty-one years of age in securing education at the University of Cincinnati. This portion of the order is unquestionably directly in furtherance of the intent of the settlor, and, as before indicated, seems to be the most logical way of carrying out the purpose of Woodward for progressive education. It is a matter of common knowledge that tuition in the University of Cincinnati is not entirely free, even to the children of the citizens of the City. While the charge is less than to non-residents, still it is of such an amount as to undoubtedly pre-

vent many children or youth from attending the University, who could otherwise do so if their tuition were paid.

That portion of the trial court's order dealing with the use and disposition of the school lot upon which Woodward High School now rests is also approved. Definite exception has been taken to this portion of the order by appellants. This lot was deeded for the same specific use for the benefit of the poor children of the city of Cincinnati. The first school erected thereon was specifically reserved for such purposes. If the use of the trust revenue for general educational purposes, for rich and poor alike, is violative of the trust purposes, certainly, it cannot be logically claimed that the use of such real property is not a departure from the trust purposes when the school erected thereon is used for the benefit, not only, of poor children but all others.

The trial court's order as to the disposition of other real estate in the corpus of the trust is also approved.

It appears that the trustees for the past eight years have been withholding the income from the trust and permitting it to accumulate and it is admitted by the appellants that the trustees have full power over such revenue to use it as the court directs. Manifestly, therefore, such revenue will be applied in the same manner prescribed by the trial court and here approved for current trust revenue.

It is a matter of interest, although extraneous to the issues here involved, that the Hon. Chase M. Davies, the trial Judge was for many years President of the Board of Education of the City of Cincinnati, and entirely familiar with the controversial issues presented by this proceeding. This fact should lend value to his logical conclusions upon the issues presented. The writer of this opinion, whose selection to write the same was entirely fortuitous, when the case was called for argument suggested that he should retire from the bench, for the reason that he graduated from Woodward High School in 1901, had been continuously an active member of its alumae association, and a Trustee thereon, and had consistently for many years insisted upon the rights and duties of the Woodward Trustees, as found to exist by Judge Davies. Both counsel in the case requested the writer to remain in the case and expressed the opinion that such experience would be helpful in a decision of the issues presented. What has been here written shows that the writer and the trial judge now are of one mind upon these issues.

A case reported in **17 Oh St 352 (McIntire's Admrs. v Zanesville)** in many respects sustains the conclusions reached herein.

In my opinion, the judgment of the trial court should be affirmed, for the reasons given.

18

HILDEBRANT, P. J., & ROSS, J., concur in syllabi, opinion and judgment.

MATTHEWS, J., dissents in separate opinion.

MATTHEWS, J., dissenting:

I am of the opinion that William Woodward by the provisions in his deeds and the corporate charters accepted by him showed that he contemplated that he was creating a public trust, eventually to be controlled and administered solely by public officials, and that the event having long since occurred, the trust is at present a public trust in the strict legal sense of that phrase. This fundamental conclusion determines the rights and duties of the parties to this action.

By Article III of the Ordinance of 1787, enacted by Congress for the government of the Northwest Territory of which Ohio is a part, it is recited that "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." When Ohio sought statehood in 1802, the constitution which it submitted to Congress as a condition of its admission into the Union as a state provided that: "But religion, morality, and knowledge being essentially necessary to good government and the happiness of mankind, schools and the means of instruction shall forever be encouraged by legislative provision not inconsistent with the rights of conscience." And by section 25 of the same article, equality of educational opportunity was insured by the provision that "No law shall be passed to prevent the poor from an equal participation in the schools and academies, colleges, and universities within this state which are endowed—from the revenue derived from donations made by the United States for the support of schools and colleges."

While the legislature passed some laws in harmony with this faith in the efficacy of education, this faith had had very little manifestation in deeds at the time William Woodward executed the first trust deed in 1826. No common or public school system had been established. However, there could be no doubt that in Ohio education was regarded as a public or governmental function. From the provisions of his deeds, there can be no doubt that William Woodward so regarded it.

In his deed of 1826 to Lewis & Cogswell he declared the trust to be for "forwarding and maintaining a free school for the education of the poor children of the City of Cincinnati." This trust was to be administered by Lewis and Cogswell and one other trustee "to be elected annually on the first Tuesday of May in each year by the qualified voters

of the City of Cincinnati to hold his office for one year and until his successor shall be elected and qualified in such manner as shall be hereafter provided by the Legislature of the State of Ohio." He also provided that if for any reason Lewis or Cogswell, or their successors failed to nominate a successor, then the vacancy should be filled by appointment by the mayor and aldermen of the City of Cincinnati (or if there was no mayor and aldermen, then by the Court of Common Pleas) and in that event the term should be for seven years, and it is clear that from that time on the sole power of appointment would, according to the terms of the deed, rest in the mayor, aldermen and voters of the City of Cincinnati.

The deed also imposed a duty upon Lewis and Cogswell to obtain from the legislature an act of incorporation as soon as convenient, and, when such act was passed, to transfer all the property to the corporation, but if the act of incorporation was refused, the conveyance was not to be void. The trust was to continue and be administered by the trustees, Lewis and Cogswell and a third to be elected at the time and in the manner determined by the City Council.

It will be observed that William Woodward by the terms of this deed fully manifested his desire that the State through its legislature and its municipal officers should take part in the administration of this trust and that upon the death or resignation of Lewis and Cogswell or their nominees, the entire control of the trust should rest in those appointed by public officers.

A third trustee was appointed and, on the application of the trustees the legislature on January 24th, 1827, passed an act (Ohio Local Laws, Vol. 25, p. 62) to incorporate "The Trustees of the Woodward Free Grammer School," composed of three trustees and their successors as therein provided. The act describes the beneficiaries more specifically and includes children between five and sixteen residing in the City of Cincinnati, who have no parents or other near relatives living within the limits of said city, of sufficient ability to provide them with an education, and also such children whose parents or other near relatives, although of sufficient ability, utterly neglect or refuse to provide them with instruction. The trustees were authorized to admit any child upon payment of a reasonable sum as tuition. If the fund was not sufficient to educate all the described children within the City of Cincinnati, then the trustees were required to select an equal number from each ward of the city.

It was provided in the act that the land should remain forever subject to the trust and that every conveyance thereof should be utterly void and of no effect. "Provided, however, that the said trustees and their successors shall have power to

make beneficial leases of all or any part of said lands, for the term of fifteen years each, or for a longer period, if the extended lease contain a clause of revaluation every fifteen years." There was no such provision in the deed of 1826 from Woodward to Lewis and Cogswell. . .

By section five of the act, a detailed method of selecting the trustees was prescribed. All trustees nominated by Lewis and Cogswell or their successors were required to be citizens of the City of Cincinnati and freeholders therein at the time when is became necessary for them to act as trustees. The third trustee was required to be an elector of the City of Cincinnati and he was required to be elected on first Tuesday of May of each year by the qualified electors of the City. As to the duties of the trustees it was provided:

"It shall be the duty of the said trustees to lease the said lands in the most beneficial manner, as soon as a sufficient sum of money shall be raised thereby, to locate and erect a commodious building, to be used and occupied as a school-house; to procure teachers of good morals and well qualified to instruct, and to receive so many of the above described children as the said building will accommodate and the state of the funds will allow; they shall keep the building in good repair, and on the first day in each year shall render a full and true account to the mayor and aldermen of the city of Cincinnati, and in case there be no mayor or aldermen, to the aforesaid Court of Common Pleas, of all moneys received by them, and all dues and demands owing to them as such, together with an account of all their expenditures and disbursements, and also of all surplus moneys in their hands, or in the hands of any treasurer appointed by them, belonging to the said trust; and the said trustees shall have power to appoint, annually, some good and responsible person resident within the city of Cincinnati, to be their treasurer, requiring of him such security, for the faithful discharge of his duties, as they shall deem sufficient. It shall be the duty of such treasurer to receive and keep safely all moneys delivered to him by the trustees on account of the said trust, and to enter the same in a book to be provided for that purpose, wherein he shall also keep an account of all disbursements made by him to the order of the trustees or otherwise, which book shall always be open to the inspection of the said trustees, and he shall moreover render an account of the same as well as of all his doings in respect to the said trust to the trustees at least ten days before the time appointed for them to account with the mayor and aldermen, as aforesaid."

And the control of the trustees was set forth in section six as follows:

"That the mayor and aldermen of the city of Cincinnati, or in case there shall be no mayor and aldermen, the Court of Common Pleas for Hamilton County, shall have power to call upon the said trustees for, and compel them to render, on the first day of January in each year, an account of the rents, issues, and profits of the said lands, and of all expenditures on account of the said trust, and also of all surplus moneys, debts, dues, and demands, in their hands, or in the hands of their treasurer, arising out of and belonging to the said trust and such account audited and allowed by the said mayor and aldermen, or said court, shall be a good and effectual discharge to the said trustees; but in case the said trustees, or either of them, on application made as aforesaid, shall refuse to render his or their account as aforesaid, then he or they shall be considered as having abandoned the trust, and the said mayor and aldermen, or the said Court of Common Pleas as aforesaid, may proceed to appoint his or their successor or successors, as is provided in the fifth section of this act, and shall also have full power to compel the said trustee or trustees to account for the same, by an action at law or a suit in chancery, and apply the proceeds of the said action or suit to the purposes aforesaid."

The mayor and aldermen were authorized to appoint visitors to examine the school and report to them.

The deed had required all teachers to be believers in the doctrines of the Christian religion. This was omitted from the act of incorporation, and it was expressly provided that the benefits of the trust should not be confined to any particular religious sect or sects.

It will be observed here that the act of incorporation changed in material respects the terms of the trust as set forth in the deed, and also brought the trustees under greater control of the public officials—either the mayor and aldermen, or in lieu thereof, the Common Pleas Court. It also carried the provision under which all the trustees would, sooner or later, be appointed by the mayor and aldermen, or the Court. It required political action in the election of the third trustee, but continued for the time being the control in non-political hands.

By deed dated March 24th, 1828, William Woodward, Samuel Lewis, and C. Cogswell joined in a deed transferring the title to this real estate to the trustees of the Woodward Free Grammer School. The only effect of their deed was to confirm in the corporation the title that had been conveyed to Lewis and Cogswell by the deed of 1826.

By 1830, those interested were considering the establish-

ment of a high school. To further that end, Woodward executed a deed consenting to a change in the purpose of the trust, so that a high school could be conducted with the trust funds. In this deed he authorized the trustees to procure an alteration in their charter "so as to allow them in their corporate character to establish a high school—for the uses and education of that description of children and young men as is pointed out in the first deed above referred to, the said William Woodward declaring hereby his assent to such alteration of the charter aforesaid, as shall by the trustees and their successors in office and by the General Assembly of the State of Oho, be thought most likely to extend the advantages of learning and science among those who have not the means of procuring such advantages themselves, proportioning the advantages thereof equally in the different wards of the city of Cincinnati, without regarding religions, or opinions or differences of opinion, or any other subject."

Later, in the same year, Woodward conveyed an additional tract of land to Lewis and Cogswell "in consideration of the better educating the rising generations" upon the proviso that a high school building be erected thereon and a high school maintained thereon "to be called the Woodward High School of Cincinnati;" and the trustees were directed to make application to-the legislature for authority to transfer the funds of Woodward Free Grammer School for the purpose of erecting and maintaining the high school, and this high school was to be managed by five trustees, appointed as follows:

"Samuel Lewis and Osmond Cogswell, are hereby empowered to hold their offices during their lives and nominate their successors severally by deed or will duly executed, and their successors are to continue to nominate their successors in the same way forever. And if it shall so happen, by reason of death, resignation, or any other cause, that either of the places of the said two trustees should at any time become vacant, such vacancy or vacancies to be filled by appointments to be made by the Court of Common Pleas of said county every seven years and until his or their successors should be duly appointed. The other three trustees to be judicious men, citizens of the city of Cincinnati, to be appointed by the city council of the said city, to hold their office after such appointment three years and until successors shall be duly appointed; that is, there shall be three persons selected to fill said places and named in the act of incorporation, viz.: Lewis Howell to continue in office three years from the first week in May next, Oliver Lovell to remain in office two years from the same time, and J. P. Foote to remain in office one year from the same time; and at the expiration

of their terms as aforesaid, the city council aforesaid shall supply their places by appointment, so that there shall be one appointment each year for the succeeding three years, and so on forever."

The next act was the granting of a corporate charter by the General Assembly. It was, in reality, an amendment of the charter theretofore granted to Woodward Free Grammer School. It incorporated the five persons named in the Woodward deed, conferred upon them the corporate name of Woodward High School of the city of Cincinnati; and conferred upon them and their successors the usual powers of a corporation. The method of appointing successor trustees set forth in the Woodward deed of the high school, and already set forth herein, was incorporated in the charter. The trust was declared to be for the benefit of "children residing in the city of Cincinnati and such children only as have no parents living within the limits of said city of sufficient ability to provide for their instruction. The same limitation on the powers to dispose of the real estate was continued. As to the duties of the trustees, it was provided that:

"It shall be the duty of said trustees to lease the said lands in the most beneficial manner, and, as soon as a sufficient sum of money is raised thereby, to locate and erect a commodious building, to be used and occupied as a schoolhouse; to procure teachers and professors of good morals, and well qualified to instruct and educate as many of the above described children as the state of the funds will allow; they shall keep the buildings in good repair, and on the first day in each year shall render a true and full account to the said city council of all moneys received by them and all dues and demands owing to them as such, together with an account of all their expenditures and disbursements, and also all surplus moneys in their hands, or in the hands of any treasurer, appointed by them, belonging to said trust; and the said trustees shall have power to appoint annually some good and responsible person, resident within the said city of Cincinnati, to be their treasurer, requiring of him such security for the faithful discharge of his duties as they shall deem sufficient. It shall be the duty of such treasurer to receive and keep safely all moneys delivered to him by the trustees on account of said trust, and to enter the same in a book to be provided for that purpose, wherein he shall also keep an account of all disbursements made by him to the order of said trustees, or otherwise, which book shall be open to the inspection of said trustees; and he shall, moreover, render an account of the same, as well as of all his doings in

relation to said trust, on the fifteenth day of December in each year.

Sec. 6. That the city council aforesaid shall have power to call upon said trustees for, and compel them to render on the first day of January in each year, an account of the rents, issues, and profits of the said lands, and of all expenditures on account of the said trust, and also of all surplus moneys, debts, dues, and demands in their hands, or in the hands of their treasurer, arising out of, and belonging to, said trust; and such account, audited and allowed by said council, shall be a good and sufficient discharge to said trustees; but in case the said trustees, or either of them, on application made, refuse to render his or their account as aforesaid, then he or they shall be considered as having abandoned the trust, and his or their places shall be filled as hereinbefore directed, and the said city council shall compel the said trustees, by action at law or in chancery, as the case may require, to render the account aforesaid."

The school was made strictly non-sectarian.

The corporation was made, in effect, the successor of the Woodward Free Grammer School with enlarged powers.

The last incorporating act was amended the following year, so as to authorize the corporation to establish a college department under the name of Woodward College of Cincinnati, but it was expressly provided that the trustees should not be discharged from any of the duties imposed by the law to which it was an amendment.

As the donor, the trustees and the General Assembly all consented to these various steps, there can be no doubt as to their validity and binding effect. And, therefore, to the extent that the earlier deed or act of incorporation conflicts with the later act of incorporation, the latter must control. As a result, we have a corporation, created for the public purpose of educating poor children, controlled by five trustees, three of whom are nominees of the mayor and aldermen of Cincinnati and the other two nominees of the first donor of property to the corporation until such time as they resign or die without naming their successors, or are removed by the mayor or aldermen for dereliction of duty, whereupon, the mayor and aldermen become the sole appointing power, and all of whom as a board are required to account annually to the city council. It should be said here that the right of Lewis and Cogswell to name their successors has long since lapsed. All the plaintiffs claim title to their position by virtue of appointment of the Common Pleas Court, acting under a law passed in 1883, noticed later.

In 1846 the legislature passed an act to organize and

classify the common schools of Cincinnati, and in this act the trustees and visitors of the common schools were authorized by and with the consent of the city council, to contract with any person or persons "whether in their individual, corporate or judiciary (fiduciary) capacity, or with any institutions in relation to any funds for school purposes that may be at the disposal of such person or persons, or such institution for the education of such children in the common schools of said city."

In 1851 a tripartite agreement between the Trustees of Woodward College and High School, the Board of Trustees of the Hughes Fund and the Trustees and Visitors of Common Schools of Cincinnati, was entered into. This agreement recited the enabling provision of the act of 1846, also that Woodward College and High School, and the Trustees of the Hughes Fund, had property and money, intended to "furnish high school education to the poorer portion of youth which they are desirous to unite with the city school fund under—a general plan which will secure high school instruction to all the youth of the city of both sexes." The parties then contracted for the establishment of two high schools called Cincinnati Woodward High School and Cincinnati Hughes High School "to be under the direction of a board of trustees" composed of six members selected by the trustees and visitors of the common schools from their number, the five Woodward trustees and two Hughes trustees, "which board shall have the usual power of trustees for the management of said schools." The trustees and visitors of common schools agreed to supplement the income from Woodward and Hughes funds with sufficient money as "will furnish high schools that will accommodate and educate all the white youth of the city as may apply for admission to such high schools." The board of trustees and visitors retained the power to fix the standard of admission and the curriculum. The power to appoint the teachers and others performing any duty or service connected with the high schools was lodged in the tripartite board which became, in time, to be known as the Union Board of High Schools, and it was given power to recommend salaries, but the fixing and paying of salaries and all other expenses were placed in the trustees and visitors of the common schools, and the income from the Woodward and Hughes funds were to be paid quarterly to such city officers as shall have charge of other city funds "to be applied toward the support of the high schools of the city aforesaid." No time was fixed for the continuance of the arrangement, but provision was made for the restoration of the status quo ante upon the failure of the trustees and visitors neglecting or refusing to comply with their engagements. This, however, could only be accomplished by

Woodward Trustees paying the Board of Education the value of the high school building.

In 1883, the General Assembly passed an act amending the act of 1831 to incorporate the Woodward High School of Cincinnati. The only important feature of this amendment was to transfer the appointment of all five of the trustees from the mayor and aldermen to the Court of Common Pleas of Hamilton county and fixing their terms at five years.

There was a subsequent amendment in 1895 of the agreement of 1851 in which the purpose was recited to be "to maintain and increase the friendly relations existing between the Board of Education and the Union Board of High Schools and to secure for the public common and High School system of Cincinnati unity in government and management." It was then agreed that all high schools should be under the exclusive control and management of the Union Board of High Schools, the funds appropriated by the Board of Education for high school purposes to be expended by it without interference by the Board of Education but the Union Board of High Schools was required to account annually to the Board of Education, the representation of the Board of Education upon the Union Board of High Schools was increased from six to seven, thereby giving it a majority of its own nominees, the Superintendent of Schools was given supervision of the high schools with power to appoint and remove teachers so long as that was the law, subject, however, to the consent of the Union Board of High Schools, and if the law was changed, so that the power could not be conferred upon the Superintendent, then the Union Board of High Schools should appoint and remove teachers. The Union Board of High Schools was given authority to fix salaries of teachers and all other employes. The parties continued the agreement of 1851 except as modified, but fixed no limit to its duration.

The parties continued to operate under the agreement and the modification from 1851 to about 1936. There were, without doubt, during the period some clashes, and the extent of control wavered between the Board of Education and the Union Board of High Schools, but as the years passed the Board of Education restricted progressively the scope of the management of the curricular and inter-mural management by the Union Board until its function was reduced to little more than an advisory body. This resulted not because of any violation of the terms of the agreement—not because of any usurpation of power—but because of a more aggressive exercise by the Board of the power conferred upon it. The Woodward trustees disputed this power and finally in retaliation withheld the income from its funds for the last

several years. However, the Board of Education still continues to use the Woodward High School Building which it erected on the land conveyed by Woodward to the Woodward College and High School for a high school site and the Woodward Trustees have not initiated any proceeding to fix the value of the building.

I think these observations on the legal relation established by the parties are sound:

(1) That as all parties thereto consented to the various deeds and charters executed during the life of Woodward, they were all bound thereby, and that the provisions of the prior documents were modified to the extent that the latter conflicted therewith. This would not involve the impairment of the obligations of a contract. Sec. 8 of Art. I of the United States Constitution only prevents a state from passing a law impairing the obligation of a contract. It does not prevent the parties from changing the obligation by mutual consent.

(2) The trust as modified was for the purpose of providing non-sectarian education for the children of Cincinnati between 5 and 16 years of age, whose parents could not or would not provide for their instruction—a public purpose, the administration of which the state and its political subdivisions had constitutional power to assume.

(3) That from the beginning the purpose was public, and from the beginning Woodward provided for participation of the public, acting directly by election of a trustee, or through the mayor and aldermen, in the administration of the trust.

(4) That as Woodward broadened the class of beneficiaries, he increased the participation of the public in the administration of the trust.

(5) That Woodward gave the mayor and aldermen power to appoint a majority of the trustees and provided contingencies in which they would appoint all, and those contingencies came to pass long ago, so that for more than a half century the trust has been administered by nominees, either of the mayor and aldermen or the Court of Common Pleas.

(6) That no provision as to duration of the arrangement between the Board of Education and the Trustees of the Woodward College and High School was stipulated, but by providing that upon the neglect or failure of the Board of Education The Woodward College and High School could cancel it, there was manifested a knowledge that it might not be perpetual and that its duration was dependent upon the faithful observance of its terms by the Board of Education, and the election.

(7) That no provision for forfeiture upon violation of any term of the trust was made, and no estate in reversion created upon the failure of the trust.

(8) The Woodward trustees have neither paid nor tendered payment to the Board of Education the worth of the building erected on the Woodward site nor taken any proceeding to have its worth determined, as provided in the agreement.

The validity of the agreement of 1851 is assailed on two grounds.

It is said that the Board of Education had no power to surrender control over the expenditures of tax money and to delegate its discretion over the operation of the public schools. For several reasons the basis of the contention is unsound.

In the first place the contract related to education which comes within the police power of the state. Neither the state nor any political subdivision could, by any contract, divest itself of power over that subject-matter. And, of course, taxation and tax funds also come within that sovereign power, which could not have been bartered away, had it been attempted.

In the second place, a careful reading of this agreement discloses that the Board of Education retained control over the fiscal affairs of the school and also over the entire administration. While it employed the Union Board of High Schools as an agency, it retained power to control its discretion at all times.

There is no novelty in the thought of combining public effort and funds with private effort and funds dedicated to public purposes. Many instances of such cooperation are recorded in the law books. The local trust created by the will of Charles ` McMicken is one of the most famous. Perin v Carey, 65 U. S. (24 How.) 465. It is true that there the City of Cincinnati was the devisee in trust, but the will provided that the trust should be administered through directors appointed by the municipal government. Under the Woodward deeds and charters the conveyance in trust was to trustees appointed by either municipal or county authority. I can see no difference in the extent of public control resulting. And in the case of the McMicken trust public funds and property have been combined with the trust funds to create and operate the University of Cincinnati. Incidentally, it should be noted that it was held that there could be no reverter of such trust property, the only effect of the violation of the terms of the trust being to give to a court of equity jurisdiction to compel a restoration of the property to the purposes of the trust. Cincinnati v McMicken, 6 C. C. 188, at 190.

The University of Cincinnati is not the only municipal college having its origin in private benefaction later to be maintained by private trust funds combined with public funds raised by taxation. Several other instances are mentioned in Chapter XII of Elliott & Chambers' College and the Courts, that chapter being devoted to a consideration of municipal universities. The fact that we are considering a high school and not a college or university can make no difference in the application of the principle. The duty of the state to provide for common and high school education was recognized long before the power to maintain a college or university was conceded.

So our conclusion is, that the Board of Education had power to enter into the agreement of 1851.

Now, was that agreement beyond the power of the Woodward trustees? It is said that it was a diversion of the funds from the purpose of the trust and **McIntire v Zanesville, 17 Oh St 352,** is said to require that conclusion. It is true that it was held under the circumstances in that case as to a trust fund created "for the use and support of a 'poor school' or 'institution' " that:

"Any permanent appropriation of the proceeds of such fund, to aid the public schools of the city of Zanesville, and thus lighten the taxes assessed upon the property of the city, would be a perversion of the fund from the legitimate objects of the donation; and a discontinuance of such appropriation will be directed."

But to say that because the court held that the permanent appropriation of the fund for the support of the public schools was a diversion of the fund from the purposes of the creator of that trust requires us to hold that this arrangement between the Board of Education and the Woodward trustees is a diversion of this fund, begs the question. It assumes that the purposes of the trusts and the manner of their administration are the same, which an analysis of the documents refutes.

To start with, there was no permanent appropriation of the Woodward funds and property to public school purposes. In fact there was an express provision for cancellation of the agreement under certain circumstances—one of the circumstances was the failure of the Board of Education to furnish high school instruction to all the youth of the city which, of course, included the "poor children." And there is no suggestion that the Board of Education has failed to perform this duty and it appears in the record that the Board of Education has spent several hundred times more of public

money than the Woodward income in furnishing high school instruction to all the youth of Cincinnati.

But above and beyond this distinction between the McIntire and Woodward trusts is the disclosed intention of the founders as to the manner of administering them. The McIntire will specifically named a private trustee to administer the trust. In no way did he manifest the slightest intention of giving any public authority any part in its administration. In contrast, Woodward provided for political action and public participation from the beginning. He provided for election of one trustee at a regular municipal election. Then he provided for the selection of a majority of the trustees by the mayor and aldermen, coupled with a provision under which they would select all trustees and this provision bcame operative long ago. Woodward showed a disposition in favor of public control.

That the poor children who were the objects of his bounty are receiving benefit, and much more, and this through an agency clearly contemplated seems clear. These considerations render inapplicable the case of McIntire v Zanesville, supra, and clearly demonstrate that the trustees were authorized to enter into the agreement of 1851.

I conclude, therefore, that both parties had capacity to enter into the agreement of 1851, and that its provisions were and are lawful in all respects.

One other subject requires consideration before the answer to the questions propounded is attempted, and that is, whether the special act of 1883 increasing to seven the number of trustees of the Union Board of High Schools nominated by the Board of Education and conferring the appointing power of the Woodward trustees upon the Common Pleas Court of Hamilton county is valid and binding upon the parties.

In considering this act we should keep in mind that Woodward contemplated that the appointing power would rest at last in public officers—that the public would have full control of the administration of the trust. We should also remember that all parties—the Board of Education and the trustees of the Woodward fund at the time acquiesced in the change and their successors continued to acquiesce therein for almost a half century—and still do. And it should also not be overlooked that the founder of the trust had in mind that the power of appointment might be shifted to the Court of Common Pleas in the event there should be no mayor and aldermen. It should also be noted that the founder had no power to impose this duty of appointment upon any public official. It was political or governmental

power to be exercised by the sovereign beyond the control of any individual. It helps to solve the problem by understanding that the effect of the act providing for the appointment by the Court of Common Pleas was to deny that power to the mayor and aldermen.

From all this it would seem that the condition had in substance arisen justifying the exercise of the power by the Court of Common Pleas if it was capable of receiving the power under the constitution and the act purporting to confer conforms to the Constitution in other respects.

The constitutional provision (Sec. 26 of Art. II) requiring all laws of a general nature to have a uniform operation throughout the state, does not inhibit special acts to control single transactions or local conditions. 8 O Jur 603, et seq. This statute seems to fall in that category. The situation was unique and its duplicate could not be found elsewhere in the state. Furthermore, the parties to this action are prevented by estoppel and waiver from raising the question of constitutionality. 8 O Jur 180, et seq.; 40 O Jur 702; Armstrong v Athens Co., 10 Ohio, 225 at 242.

There is no express prohibition against conferring appointing power upon the courts. Such acts have been passed and courts have accepted the burden and the validity of their appointments have not been questioned. 32 O Jur 917. Certainly, the appointees are in no position to challenge their own title.

My conclusion is that the power of appointment of the Trustees of Woodward College and High School resides in the Court of Common Pleas of Hamilton county.

I come now to a consideration of the substance of the declaratory judgment required by my conclusions.

Before proceeding, however, to do so, it might be well to expressly state that my conclusions sustain all the acts and proceedings of the parties and leave only an interpretation of their meaning and legal effect. There has been no departure from the purposes of the founder of the trust and there would be no departure by a continuance of the arrangement so long as the Board of Education continues to furnish education for all the children of Cincinnati.

My associates, by attributing to William Woodward a progressive intent to abandon every field of education into which he had encouraged the public to enter, and then to explore for virgin soil in the educational domain, they now attribute to him an intent to wander outside that field to establish not a trust for educational purposes, but one for eleemosynary purposes by holding that the fund should be used to pay for the necessaries of life of students attending

the University of Cincinnati. I find nothing in the acts of William Woodward upon which to predicate the conclusion that he had any such continuing progressive intent.

Furthermore, the conclusion reached by my associates that the agreement of 1851 was beyond the power of the parties and, therefore, void, rests upon the assumption that they tried to bind themselves beyond their legal power, which is an unwarranted assumption. Rather the presumption should be indulged that they intended that their cooperation should be within the limits of the law and the construction should be placed upon it that would so limit it. My associates, in effect, say that the parties couldn't bind themselves in certain respects, but that because they did bind themselves in those respects, the entire agreement is void—which is a classic non-sequitur.

The appellant brings in question on this appeal only two of the declarations of the trial court. In the first declaration, the court declared that the provisions of the contract of 1851, providing for tuition-free high schools were invalid, and that the Woodward trustees had no legal authority to transfer the income to the Cincinnati Board of Education to apply toward the public schools of the City of Cincinnati. In my opinion, as already stated, the contract is valid and, therefore, the Woodward trustees have the power to cooperate with the Cincinnati Board of Education in the manner provided in that contract and in that way contribute the Woodward fund to the larger fund of tax money expended for the education of the poor children of Cincinnati.

The other challenged declaration was that the Woodward trustees had no power to use any of the funds to establish or maintain a playground in connection with Woodward High School, or to sell any of the real estate for the purpose of securing funds for that purpose.

In my opinion the Woodward trustees do have the power to expend funds to establish and maintain a school athletic field and playground in connection with Woodward High School, and, if authorized by a court of competent jurisdiction, could sell any of the real estate under their control and re-invest the funds in such an athletic field and playground. Asylum v Lefebre, 69 N. H., 238, 45 Atl., 1087. Of course, the fund could not be diverted to the purchase of a public park. However, it is clear that the Woodward trustees are in no position to disturb the present use of the real estate forming the site of Woodward High School. They have taken no steps to have the value of the building determined.

For these reasons, I am of the opinion that the judgment should be reversed and judgment entered in this Court in accordance with this opinion.